1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KW, parent of minor EW,

     Plaintiff,

  v.

PENINSULA SCHOOL DISTRICT,

     Defendant.

CASE NO. 3:24-cv-05820-BAT

**ORDER ON ADMINISTRATIVE APPEAL**

   Plaintiff K.W. ("Parent") appeals on behalf of her minor daughter E.W. ("E.W.") from the July 2, 2024 Final Order of Administrative Law Judge Jill H. Brown, pursuant to 20 U.S.C. § 1415(i)(2) and Wash. Admin. Code § 392-172A-05115. Having reviewed the parties' briefing, administrative record, and applicable law, the Court **DENIES** Parent's appeal, **AFFIRMS** the ALJ's Order, and **GRANTS** judgment as a matter of law in favor of PSD.

<u>BACKGROUND</u>

A. <u>Statutory Context</u>

   "The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (quoting *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992)). In exchange for IDEA funds, school districts must provide a free appropriate public education ("FAPE") to all eligible children. *See* 20 U.S.C. § 1400(d)(1)(A); *see also id.* § 1412(a)(1). A FAPE includes both "special education" and "related services." *Id.* § 1401(9).

1    "Special education" is "specially designed instruction ... to meet the unique needs of a child with

2    a disability"; "related services" are the support services "required to assist a child ... to benefit

3    from" that instruction. *Id*. §§ 1401(26), (29). A school district must provide a child with

4    disabilities such special education and related services "in conformity with the [child's]

5    individualized education program," or "IEP." *Id*. § 1401(9)(D).

6         "The IEP is 'the centerpiece of the statute's education delivery system for disabled

7    children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 391

8    (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP is prepared by a child's "IEP

9    Team" (teachers, school officials, and parents) in compliance with a detailed set of procedures.

10   20 U.S.C. § 1414(d)(1)(B). An IEP must contain statements of the child's present levels of

11   academic achievement, measurable annual goals, and the special education and related services

12   to be provided to the child. *Id*. § 1414(d)(1)(A)(i).

13        If parents and educators disagree about an IEP, they may turn to mediation. *See* 20 U.S.C.

14   §§ 1415(e), (f)(1)(B)(i). If mediation fails, the parties may proceed to a "due process hearing."

15   *Id*. §§ 1415(f)(1)(A). In Washington State, the Office of Administrative Hearings conducts IDEA

16   due process hearings. RCW 28A.155.020; WAC 392-101-010(2). At a due process hearing, an

17   administrative officer will grant relief if they conclude a child was denied a FAPE. *Id*. A parent

18   may appeal a due process hearing decision after exhausting administrative procedures. 20 U.S.C.

19   § 1415(l). At the end of the administrative process, the losing party may seek redress in state or

20   federal court. 20 U.S.C. § 1415(i)(2)(A).

21   B.    <u>Statement of Facts</u>

22        Since preschool, E.W. has been eligible to receive special education services due to a

23   genetic condition, HUWE1 and its related developmental delays, as well as several visual

ORDER ON ADMINISTRATIVE APPEAL -
2

conditions, including Cortical Visual Impairment ("CVI"). AR 2017-56; AR 2094; AR 2426. E.W. has motor delays and dexterity issues that make the use of sign language difficult. AR 49 (Comstock). E.W. used multi-modal communication, including adapted or modified signs, gestures, augmented assistive technology ("AAC") and limited vocalizations. AR 2118-19; AR 2127; AR 483 (Malek); AR 972 (Amici). Due to the severity of her disabilities, E.W. spent a portion of her day in the Options program at Harbor Heights Elementary, a self-contained special education program focused on students with profound disabilities. AR 2021 (FF 1) (AR 2017-56) (Decision from Due Process filing dated October 1, 2020).

Although E.W. had been diagnosed with mild hearing loss early in life, she was assessed to be within normal limits in 2019. AR 2022 (FF 3-4); AR 2198; AR 163, 165, 170 (McCall). In January 2021, E.W. was included in the State's Deaf/Blind child count for one year but was not qualified as Deaf/Blind until a documented mild hearing loss was established in July 2021. AR 2100-01; AR 2198-99; AR 2606; AR 165 (McCall); AR 324-25, 368 (Humes).

In the fall of 2019, during E.W.'s third grade year, Parent requested E.W. spend the full school day in general education. E.W.'s school team agreed to increase her time in general education from 12% to 57%. AR 2023 (FF 7, 11). Parent then initiated an administrative due process hearing against the District. AR 1491, 1494, 1642 (Truitt)[1]; AR 2025. To resolve Parent's issue, the District increased E.W.'s time in general education to 74%, with the remainder of her day spent in the special education setting. AR 2025-26; AR 1521 (Truitt).

On October 1, 2020, Parent filed another due process request regarding E.W.'s educational program. AR 2017-20 (the "Prior Hearing"). On October 27, 2020, while the Prior

---

[1]Lynne Truitt had worked in public education for over forty years and was in her second year as a special education administrator in the 2021-2022 school year. AR 1485-87, 1499 (Truitt).

ORDER ON ADMINISTRATIVE APPEAL -
3

Hearing was pending, E.W.'s IEP team developed a new annual IEP for E.W. AR 2057-85 (the "October 2020 IEP"). Per Parent's request, the October 2020 IEP called for E.W. to be in the general education setting 81.54% of the day. AR 2080. The team did not determine E.W. needed extended school year ("ESY") services, and Parent did not challenge this determination. AR 2017; AR 2083. The team, including Parent, did not identify any need for a Teacher of the Deaf ("ToD"), Braille, or intervener[2], and at the time, E.W. did not have a documented hearing loss. AR 2036 (FF 48); AR 2057-85; AR 2101; AR 2198-99; AR 165 (McCall). In response to Parent's request that the District increase E.W.'s sign language vocabulary, E.W.'s IEP included a goal focused on improving her use of functional sign language. AR 2070.

The Prior Hearing was conducted in February 2021. AR 2017. Katie Humes, Director of the Washington Deaf/Blind Project (the "WD/BP"), testified that E.W. had been placed on the Deaf/Blind Child Count in January 2021, but ALJ Beebe found as fact that Ms. Humes had not concluded that E.W. had a hearing disability, only that she would benefit from additional testing. AR 2036 (FF 47). Ms. Humes also did not testify that E.W. required an intervener or tactile signing. The ALJ found that Parent had not requested an intervener when the October 2020 IEP was developed. AR 2036 (FF 48). In her April 1, 2021 decision, ALJ Beebe concluded there was no documented need for an intervener or Braille instruction. AR 2047-49 (CL 45-55).

Although the October 2020 IEP team determined that ESY services were not necessary for E.W., the District offered to provide E.W. services during the summer between fourth and fifth grades, but Parent declined. AR 3394-99; AR 1625-26, 1660 (Parent).

---

[2] An intervener is an individual, often a paraeducator, trained to support an individual with vision and hearing impairments. AR 2026 n.8; AR 2517-22; AR 2527; AR 237-38 (Packard); AR 362 (Humes).

ORDER ON ADMINISTRATIVE APPEAL -
4

E.W.'s Fifth Grade Year at Harbor Heights - the 2021-22 School Year

The first school year at issue was the 2021-2022 school year, E.W.'s fifth grade year. Justine Malek served as E.W.'s special education teacher and case manager. AR 1307 (Malek). Ms. Malek began the WD/BP-hosted Open Hands Open Access ("OHOA") training modules in February 2022 and used material from those modules to train staff working with E.W. AR 475-78 (Alsop); AR 1318 (Pellegrini); AR 2318. The WD/BP offers these modules to train providers working with individuals who have both vision and hearing impairments. AR 3547. Ms. Malek also worked with E.W.'s general education teachers to modify E.W.'s materials and assignments for use in the general education classroom. AR 2302; AR 302, 305 (Pelander). Ms. Pelander testified E.W. could independently communicate. AR 300-01, 315 (Pelander) (testifying to reduction in need for prompts, E.W.'s participation in end of day compliments and use of AAC device), and AR 2300 (Comstock) (reporting independent communication). E.W. also continued to receive communication services and AAC support from her long-time District speech language pathologist ("SLP"), Elizabeth Comstock, and CVI-related vision services from the District's Teacher of the Visually Impaired ("TVI"), Elise Bullinger-Sandstrom. AR 2090; AR 2219-25; AR 82-84 (Comstock). Ms. Malek provided Parent with daily written communication regarding E.W. AR 2225-95; AR 2300-60; AR 1308-09 (Malek).

E.W. Reevaluation Completed in November 2021

In the fall of E.W.'s fifth grade year, the District initiated[3] a special education reevaluation of E.W. The IEP team agreed to continue implementing the October 2020 IEP past the annual review date while the reevaluation was ongoing. AR 2086-89; AR 1311-12 (Malek).

---

[3] Parent states she requested the reevaluation and asked that E.W. be evaluated in the behavioral area. AR 2197.

1    At Parent's request, the District contracted with the WD/BP to participate in the reevaluation.

2    AR 2098; AR 2196; AR 199, 217-19 (Packard); AR 1503 (Truitt). School psychologist,

3    Samantha Ewing, prepared the lengthy reevaluation report. AR 2090-2200 (the "November 2021

4    Reevaluation"); AR 416 (Ewing). As part of the evaluation, Ms. Ewing conducted various testing

5    measures, including those of E.W.'s cognitive functioning and adaptive skills. AR 2105-13.

6         Ms. Ewing also obtained rating scale information from Parent and District staff using the

7    Behavior Assessment System for Children-3rd Edition ("BASC-3"). AR 2105-13; AR 391-92,

8    417 (Ewing) (explaining appropriateness of using non-verbal test with E.W. and purpose of

9    rating scales). In addition to other information, the BASC-3 results showed clinically significant

10   results in the area of Developmental Social Disorders, which the test publisher noted could be

11   related to developmental disorders such as autism or could be the result of poor socialization. AR

12   2654-55. Ms. Ewing testified that the BASC-3 results are not a reliable indicator of whether a

13   student is on the autism spectrum, "because there [are] a lot of other things that can cause that

14   response pattern for a student." AR 396 (Ewing). Parent did not raise a concern regarding autism

15   either prior to or during the evaluation meeting. AR 2163-64; AR 101 (Comstock); AR 396

16   (Ewing); AR 1322 (Malek); AR 1523 (Truitt); AR 1645 (Parent); *see also* AR 2196 (consent

17   form). No one raised concerns that E.W. might have autism. AR 1982 (FF 172).

18        Included in EW's reevaluation report is information from a private evaluation

19   establishing EW's vision was 20/1400 in both eyes with her best correction, which is legally

20   blind. FF 1944; AR 2716; AR 3419-3420; AR 2100. PSD audiologist, Amy McCall, evaluated

21   E.W.'s hearing, which revealed mild to moderate sensorineural hearing loss in both ears. FF

22   1944; AR 2717. McCall recommended that EW sit toward the front of the classroom and use

23   mild hearing aids with an FM/DM system ("FM System") or access a quieter learning

ORDER ON ADMINISTRATIVE APPEAL -
6

environment. FF 1945 AR 2719; AR 137 (McCall). The reevaluation also reported E.W.'s

academic performance and progress towards her IEP goals, with data and test results from an

academic assessment performed by Parent's private evaluator, Sonja Hemmerling. AR 456-70,

2114-17 (Malek); *see also* AR 393-94, 418(Ewing) (standardized academic achievement tests

not appropriate); AR 111 (Comstock) (same). The data indicated E.W. had limited academic

skills. AR 2113-17.

Ms. Comstock, the District SLP who had worked with E.W. since preschool, evaluated

E.W.'s communication abilities. AR 2117-28; AR 31-32, 34, 84-88 (Comstock). Ms. Comstock

reviewed E.W.'s history, her progress on communication goals, including the use of adapted

signs and AAC device, assessed her receptive and pragmatic language and conducted a detailed

assessment of her functional communication abilities. AR 2117-28. Amy McCall, the District

audiologist, reviewed new hearing results for E.W. reflecting her recent diagnosis with mild

hearing loss. AR 2101-02.[4] The District's TVI, Ms. Bullinger-Sandstrom, completed a

Functional Vision Assessment.[5] AR 2141-46; AR 226 (Packard). Based on her assessment,

particularly that E.W.'s primary sensory channel remained her vision, Ms. Bullinger-Sandstrom

did not recommend Braille instruction. AR 2143. Emma Packard, from the WD/BP, completed a

CVI range assessment with E.W. and concluded that E.W. was "starting to resolve many of the

characteristics of CVI." AR 2138-41; *see also* AR 223-24 (Packard). Ms. Packard identified the

potential for an intervener to support E.W. but deferred to E.W.'s IEP team to determine if this

[4] At the time of hearing, Ms. McCall had been an audiologist for 20 years. AR 132-33 (McCall).
She previously worked with E.W. in preschool and early elementary school before E.W.'s
hearing was assessed to be within normal limits in 2019. AR 2198; AR 163, 165, 170 (McCall).

[5] Further information on Ms. Bullinger-Sandstrom's qualifications is not in the record, as she was
not a witness. AR 1243-44 (Rush); cf. AR 2036 n.13. Ms. Truitt believed that Ms. Bullinger-
Sandstrom was knowledgeable about Deaf/Blind students. AR 1497-98 (Truitt).

ORDER ON ADMINISTRATIVE APPEAL -
7

1    was necessary. AR 2140; AR 2495-2516; AR 206-08 (Packard). Julie Rodenberg, a District

2    Occupational Therapist ("OT") and member the Assistive Technology ("AT") team, completed

3    an assessment of E.W.'s AT needs, along with Joe Dlugo, an AT specialist from the State School

4    for the Blind. AR 2150-54; AR 1063 (Rodenberg).

5        Based on the data, the team determined that E.W. continued to qualify for special

6    education services. AR 2095; AR 102 (Comstock); AR 387-88 (Ewing). In addition to

7    comprehensive educational services, the team recommended adding audiology support due to the

8    new mild hearing loss results from that summer. AR 2097; AR 170-71 (McCall).

9        The reevaluation team, including Parent, her advocates, and staff from WD/BP, met twice

10   for a total of over four hours to review the reevaluation and Functional Behavior Assessment

11   ("FBA"). AR 2163; AR 2373 (FF 5); AR 425 (Ewing).[6] Ms. Malek and other staff relayed

12   concerns regarding E.W.'s progress without more intensive instruction within a special education

13   setting. AR 2103-04; AR 77, 84, 93 (Comstock); AR 167 (McCall); AR 1312-14, 1327 (Malek);

14   *see also* AR 1502 (Truitt); AR 299-300 (Pelander).

15       Parent elected not to sign the reevaluation report and stated she would submit a dissenting

16   opinion in writing. AR 2164. Parent contends she expressed concerns about several components

17   of the evaluation (FF 1959; AR 2780) and did not sign the reevaluation report because it did not

18   evaluate E.W. in ASL; cognitive testing was not administered by someone knowledgeable in

19   assessing a DB child; no formal assessment was attempted for math, reading, or writing; there

20   was no assessment of E.W. with regard to access to peer communication; and the reevaluation

21

22   _____

     [6] Based on the draft FBA, the District staff had not identified a need for a Behavior Intervention
23   Plan ("BIP") for E.W. AR 2162; AR 2203; AR 427, 435-36 (Ewing); *see also* AR 453, 1315
     (Malek). Parent does not challenge the ALJ's determination that a BIP was not needed. AR
     2013-14 (CL 79-81).

ORDER ON ADMINISTRATIVE APPEAL -
8

did not consider EW's classroom setting communication needs. AR 1950, FF 52; AR 1959, FF 82; AR 3440-3442.

E.W.'s New IEP is Completed in June 2022

E.W.'s IEP team was scheduled to meet on November 29, 2021, to review a draft IEP. AR 2208-09; AR 2373 (FF 7). Parent provided written input stating her belief that having E.W. in the general education setting 80% of the day remained "the most appropriate." AR 3491, 3496; *see also* AR 2302; AR 1318 (Malek). Parent then requested to have legal counsel participate in the IEP meeting, which resulted in the meeting being rescheduled so the District's counsel could attend. AR 3442. Parent's counsel also requested the district conduct an independent educational evaluation ("IEE") of E.W. AR 3440. When a parent requests an IEE, a school district must either grant the request or initiate a due process proceeding to defend the appropriateness of its last evaluation. Wash. Admin. Code § 392-172A-05005(2)(c). Believing its reevaluation was appropriate, the District filed a due process hearing request on December 6, 2021. AR 1506 (Truitt); AR 2376 (SECC Decision).

The IEP team, including counsel for Parent and the District, met for three hours on December 10, 2021, to review the new draft IEP. AR 1316 (Malek); AR 3491-97. Toward the end of the meeting, Parent stated she would be filing a due process hearing request against the District regarding the proposed IEP. AR 1601 (Parent). The team, therefore, did not complete its discussion of the IEP. AR 1317 (Malek) (IEP is what triggered Parent to file, thereby pausing process); AR 1506 (Truitt). A later prior written notice memorialized that Parent requested to delay the review of the IEP due to her plans to file. AR 2426[7]. Parent filed her hearing request on

---

[7] Parent states she did not agree to postpone discussion of development of EW's IEP but continued to request a one-to-one intervener trained in dual sensory loss; an interpreter; a BCBA;

January 14, 2022. AR 2373 (FF 9). In late January, Parent emailed the District regarding scheduling another IEP meeting, and the District proposed to meet on February 11, 2022. AR 2316-17. Parent declined that date, and the District suggested meeting after the District's mid-winter break later that month. *Id.*; AR 2532. The District scheduled another IEP team meeting for March 8, 2022, but after Parent reported she had not been notified, the team did not convene on that date. AR 2330. Later that month, Parent requested new IEP team meeting dates for a time after Dy Thompson, her private provider, observed E.W. at school. AR 2332.

On April 6, 2022, the District offered a meeting on April 27, 2022, following the District's spring break. AR 2338; AR 2532. During the District's spring break in April 2022, Parent withdrew her due process hearing and IEE requests, which caused the District to withdraw its hearing request to defend the November 2021 Reevaluation. AR 2335-36; AR 2379 (FF 11); AR 2532. Parent also responded during the break to the District's offer of a late April IEP team meeting but requested that another private provider, Linda Alsop[8], first observe E.W. at school and then participate in any proposed IEP team meeting. AR 2338. The District was able to coordinate Ms. Alsop's observation for April 22, 2022. AR 2341-42.

Following Ms. Alsop's observation, E.W.'s IEP team met on May 24, May 26, and June 7, 2022. *See*, *e.g.*, AR 2343-44; AR 2347; AR 1320 (Malek). Parent invited Ms. Alsop to assist with Parent's requests for E.W. to have an intervener at school and to use tactile signing. AR 2338; AR 2374 (FF 14); AR 606-07, 623 (Alsop). Tactile signing is a form of sign language

and ESY services. AR 1960, FF 90; AR 3376-3378. While the ALJ noted December 10, 2021 as the first time Parent requested an intervener (AR 1961, FF 91), Parent states PSD was on notice of her belief E.W. required intervener services since at least November 2020. AR 2017, 2019.

[8] Alsop has a bachelor's degree in special education and a master's degree in communicative disorders—deaf education. She is the director and developer of the Utah State University Program of Studies in DeafBlindness. AR 3310-3312.

ORDER ON ADMINISTRATIVE APPEAL -
10

distinct from ASL, as it uses the hands of the communication partner to help physically convey the signs to an individual with vision or other challenges. AR 367 (Humes); AR 1210-11 (Wilson) (noting "significant differences" between ASL and tactile signing). The District agreed to add an intervener to support E.W. AR 2426 (6/17/22 PWN); AR 2299 (6/24/22 PWN). At the time of Ms. Alsop's observation, E.W. was not using tactile signing. AR 619 (Alsop). Ms. Alsop's conclusion that tactile signing was the most effective form of communication for E.W. was based on research, and not E.W.'s effective use of this form of communication. AR 618-19 (Alsop). Instead, E.W. continued to use multi-modal means of communication, including adapted signs, and could sign approximately 30 to 40 signs by the end of her fifth-grade year. AR 1966 (FF 111); AR 41, 126 (Comstock).

Parent contends the ALJ incorrectly found that the May 24, 2022 IEP meeting was the first time Parent requested the use of tactile signing with E.W. Dkt. 19 at 9. To support her claim, Parent points to an audiology report from August 2021 in which tactile signing is discussed. AR 2198-2200. However, there is no evidence Parent ever requested the use of tactile signing with E.W. prior to May 2022. Parent stated in late May that she "discover[ed]" E.W.'s ideal mode of communication was tactile signing only after beginning to work with Ms. Alsop in the spring of 2022. AR 2349. Because E.W. was not communicating using tactile signing at that time, the District "deferred any decision on [Parent's] request" until the intervener began working with E.W., at which time it would revisit the need for tactile signing. AR 2300.

At the May 26, 2022, IEP meeting held two days later, Parent testified she discussed whether E.W. should receive services from a ToD with the District's audiologist, Ms. McCall. AR 3383. Ms. McCall testified that the team deferred the decision to add a ToD and agreed to revisit it after implementing intervener services to allow the intervener to provide input as to

1   whether such services were needed. AR 179 (McCall). Ms. McCall testified that the intervener

2   would have a better sense for the dual sensory piece related to E.W.'s vision and hearing,

3   whereas the ToD be focused solely on hearing loss. AR 180 (McCall). Significantly, Ms.

4   Alsop did not recommend E.W. receive services from a ToD or that she participate in a program

5   for Deaf and Hard of Hearing ("DHH") students in her observation report. AR 1968 (FF 119);

6   AR 3314-15; AR 621 (Alsop). The team concluded the development of E.W.'s new IEP in June

7   2022. AR 2393-2426 (the "June 2022 IEP"). At Parent's request, the team agreed to continue

8   maximizing E.W.'s time in general education but reduced that time to 68.32%. AR 2421-22; *see*

9   *also* AR 1507, 1510 (Truitt); AR 1322-23 (Malek); AR 96-97 (Comstock); AR 313 (Pelander).

10  The IEP team also agreed to add an intervener to support E.W. but declined to require this person

11  have university-level training or tactile signing ability. AR 2426 (6/17/22 PWN); AR 2299

12  (6/24/22 PWN); AR 1329 (Malek); AR 1492, 1507-08, 1516 (Truitt). The District explained it

13  would provide an intervener with the training necessary to work in a public school setting. AR

14  2299. There are no statutory training requirements for an intervener or requirement that an

15  intervener possess the level of training Parent requested. *See*, *e.g*., AR 1974 (FF 140); AR 2007

16  (CL 59).

17          That spring, the staff began preparing for E.W.'s transition from Harbor Heights to sixth

18  grade at Goodman Middle School ("Goodman"). This included offering to have E.W. tour

19  Goodman and preparing a transition summary for E.W.'s new staff. AR 1084-87 (Musgrove);

20  AR 1320 (Malek); AR 2334; AR 2362-67. Over the summer, the District arranged for several

21  District paraeducators to participate in the OHOA intervener training modules to support E.W. at

22  Goodman. AR 1512, 1516, 1519 (Truitt); AR 1087-88, 1090- 91 (Musgrove); AR 949 (Crum);

23  AR 962 (Crowder); AR 3547 (OHOA training module description). Although the training

modules do not result in a certification, the ALJ found "they provide much of the same information that an intervener would learn in a certified program." AR 1974 (FF 140). Goodman administration advised Parent of the training and provided E.W.'s class schedule for the fall. AR 1090-91 (Musgrove); AR 2359.

The District also offered E.W. ESY services that summer, but Parent did not accept. AR 2425; AR 3517 (Parent letter); AR 1494 (Truitt). Parent testified PSD had offered a preset ESY program for E.W. that was not individualized to meet her needs and asked that Thompson assist E.W. during the ESY. AR 1650-1651(KW). Following the meeting, KW requested that the team modify the ESY offer to allow EW to work with an intervener. AR 3517. PSD declined this request, however, Truitt testified that an intervener could have worked with EW on existing skills. FF 1969; AR 1491-1492, 1520 (Truitt).

<u>Parent Withdraws E.W. from the District in August 2022</u>

On August 5, 2022, Dawn Musgrove, the Assistant Principal at Goodman Middle School ("Goodman") informed KW that two paraeducators were planning to begin intervener training. FF 1976; AR 3532, 3542, 3547. April Crowder completed one of the 27 OHOA M and her proficiency with sign language is "very low." AR 2960; AR 963 (Crowder). Meagan Crum knew a few basic signs and completed two or three of the 27 OHOA M. AR 2960; AR 949-950 (Crum).

On August 23, 2022, the District received a letter from Parent stating she was unilaterally enrolling E.W. at a private Catholic school, St. Nicholas. AR 3550; *see also* AR 2533; AR 2368; AR 1610 (Parent). E.W.'s sibling was also enrolled at St. Nicholas. AR 1613, 1632-33, 1651, 1670-71 (Parent); AR 3845-48. In response, the District issued a prior written notice ("PWN")

1    declining to fund Parent's unilateral placement. AR 2368; AR 1245-46, 1584 (Rush).[9] The

2    District offered to convene E.W.'s IEP team to review Parent's concerns but Parent did not

3    request a meeting during the 2022-2023 school year. AR 1247, 1580 (Rush).

4         Parent states she decided to move E.W. to St. Nicholas because PSD had no intention of

5    providing intervener training to E.W.'s paraeducators and instead intended to have them review

6    some of the 27 OHOA M and none of E.W.'s paraeducators would have the ability to

7    meaningfully communicate with E.W. because the paraeducators had "very low" to nearly

8    nonexistent sign language skills. Id.; AR 3532, 3542, 3547, 3529-50; AR 1609-13 (KW); AR

9    963 (Crowder); AR 949-950 (Crum). In addition, St. Nicholas allowed E.W. to have an

10   intervener. FF 1976; AR 1670- 71 (KW); AR 3303; AR 543-45 (Alsop). In August, Parent hired

11   Jennifer Pellegrini to work as E.W.'s intervener. FF 1977. Pellegrini was supervised by Alsop

12   during her intervener training. FF at 49. Pellegrini also completed a 40-hour training required for

13   a Registered Behavior Technician ("RBT"). AR 1977, FF 152. She knew between 25-50 signs

14   when she began working with E.W. and increased her knowledge of sign through her enrollment

15   in Utah State's intervener program and by self-study. AR 3601-03, ¶¶3, 9; AR 1440-03.

16        Parent states she was unaware of the requirement to provide 10 business days' notice of a

17   unilateral placement, but she would not have been able to provide it earlier because she had not

18   received information about the intervener's training until August 19, 2022. Id. at 1611.

19        In late November 2022, Parent filed a Special Education Community Complaint

20   ("SECC") against the District with the Washington State Office of the Superintendent of Public

21   Instruction ("OSPI"). AR 2369-87. OSPI rejected Parent's allegation regarding E.W.'s need for

22

23   _____

     [9] Ms. Rush is a former special education teacher and building administrator. AR 1234-35 (Rush).
     She took over for Ms. Truitt as a District special education administrator over the summer of
     2022. Id.

ORDER ON ADMINISTRATIVE APPEAL -
14

1   an intervener during the 2021-2022 school year.[10] OSPI further concluded the District did not

2   violate the IDEA when it continued implementing the October 2020 IEP while the parties' due

3   process hearing requests were pending. AR 2381-82 (detailing events).

4        E.W.'s Experience at St. Nicholas During 2022-2023 School Year

5        On August 29, 2022, E.W. began attending St. Nicholas for sixth grade. AR 1650

6   (Parent); AR 1439 (Pelligrini). Parent paid Jennifer Pelligrini to accompany E.W. at St. Nicholas

7   as E.W.'s intervener. AR 1631, 1670-71 (Parent); AR 1436 (Pelligrini). Ms. Pelligrini completed

8   the remote Utah State University Intervenor Training Program and is a credentialed intervener

9   for the deafblind. She completed the intervener training simultaneously while working with E.W.

10  at St. Nicholas and received her intervener credential in January 2024 (after she stopped

11  accompanying E.W. at St. Nicholas). AR 1247, 1279-1280; AR 1404, 1437-38, 1441 (Pelligrini);

12  AR 610 (Alsop); AR 1642 (Parent).[11]

13       When Ms. Pellegrini began working with E.W., she believed E.W. had an independent

14  expressive language vocabulary of four or five ASL signs. FF 155. By the end of the 2022-2023

15  school year, E.W. could independently express approximately 39 ASL or modified ASL signs.

16  *Id.* Ms. Pellegrini believes the progress she witnessed in E.W. during the 2022-2023 school year

17  hinged on Ms. Pellegrini's training through the National Intervener Training Program. *Id.*

18       While at St. Nicholas, E.W. did not access any special education teacher, SLP, OT, TVI,

19  TVSI or ToD. AR 1651 (Parent); AR 1457 (Pelligrini); AR 1977 (FF 153). Nor did any

20

21  [10]Community Complaint decisions are not binding on an ALJ deciding the same issues. Wash.
    Admin. Code § 392-172A-05035.

22  [11]Ms. Pelligrini is not a certificated teacher and had not worked in a public school setting until
    after the 2022-2023 school year. AR 1450, 1475 (Pelligrini). Ms. Pelligrini described her ASL
23  knowledge as "limited," had even less experience with tactile signing, and no experience with
    Deaf/Blind students prior to being hired by Parent. AR 1399-1400, 1442, 1444-45 (Pelligrini);
    AR 3067.

ORDER ON ADMINISTRATIVE APPEAL -
15

1    certificated teacher provide direct oversight and supervision for Ms. Pelligrini's daily

2    interactions with E.W. as is reportedly "best practice." AR 1451 (Pelligrini); AR 372, 377, 379

3    (Humes); AR 615 (Alsop); *see also* AR 3735 (job description noting intervener "must always be

4    working under the guidance and supervision" of special education teacher).

5    　　　　Parent did not call any staff from St. Nicholas to testify regarding E.W.'s educational

6    program and progress, if any.

7    　　　　　　　Parent Re-Enrolls E.W. in the District in August 2023

8    　　　　In late July 2023, Parent's counsel initiated the due process proceeding at issue. The

9    following month, Parent unexpectedly re-enrolled E.W. in the District and requested that she

10    attend Goodman. AR 2388; AR 1247 (Rush). At the time Parent contacted the District, Pellegrini

11    had notified Parent that she would no longer be able to serve as E.W.'s intervener (AR 1614

12    (KW)) and Parent was unaware of an available trained intervener to work with E.W. AR 1653-54

13    (Parent).

14    　　　　The District prepared for E.W.'s arrival at Goodman, including re-starting the intervener

15    training process for paraeducators, Eleanor Ficca, Meagan Crum, and April Crowder. AR 1238-

16    39, 1250-51 (Rush); AR 1091 (Musgrove). WD/BP hosted the training of District staff, which

17    used the OHOA modules. *Id*. The District also proposed implementing the June 2022 IEP while

18    the staff at Goodman got to know E.W. and evaluate her needs following her year at St.

19    Nicholas. AR 2389; AR 1248, 1250-51 (Rush).

20    　　　　E.W.'s IEP team met on September 6, 2023. AR 2430-36; AR 2534; AR 1248-49 (Rush).

21    Dr. Jamie Wilson, who had been hired by Parent to evaluate E.W. in May 2023, participated in

22    the meeting on Parent's behalf. Following the meeting, the District issued a PWN stating it was

23    proposing to continue the June 2022 IEP for approximately three weeks to allow E.W. time to

ORDER ON ADMINISTRATIVE APPEAL -
16

get settled at Goodman and for staff to observe her functional performance. AR 2435. The District indicated it would consider information from St. Nicholas, Pellegrini, and Dr. Wilson as part of the reevaluation. FF 1982. The District also stated that, at that time, it was rejecting Parent's request for a staff member trained in tactile signing until the assigned interveners had an opportunity to work with E.W. and the team could determine whether this was needed. *Id.*

Following the meeting, Parent provided the District a copy of a private evaluation report from Dr. Wilson conducted on May 18, 2023 (while E.W. was attending St. Nicholas). AR 3554-61 (transmittal on 9/21/23); AR 3385; AR 3344-61.[12] Although Parent contends the ALJ incorrectly stated that Dr. Wilson met E.W. more than 18 months after the District's November 2021 Reevaluation and more than 12 months after the drafting of the June 2022 IEP, this is accurate because the June 2022 IEP was initially drafted in December 2021. Dkt. 19 at 15; AR 2208-09; AR 2373 (FF 7).

Dr. Wilson concluded, as had the District, that E.W. had limited communication skills and performed in the extremely low range in all academic areas. AR 1980 (FF 165); AR 3325. Dr. Wilson also diagnosed E.W. with autism based on the Social Responsiveness scale ("SRS-2"). AR 3354. Dr. Wilson believed E.W.'s test results should have resulted in a referral by the District for further testing for autism. FF 167. Although the Wilson report states "specific … instruments were administered" to reach this diagnosis, the report identified only the SRS-2. AR 3353, 3360; AR 1354 (Wilson). Dr. Wilson could not recall who completed the single rating

---

[12] Dr. Wilson is a board-certified neuropsychologist, medical psychologist, and rehabilitation psychologist, whose practice focuses on deaf, hard of hearing, and blind populations. AR 3330-42 (C.V.) He has conducted over 1,000 neuro-psychological exams with DHH, DB, and blind individuals and taught ASL and best practices for communicating with DHH. AR 3333. Dr. Wilson frequently testifies as an expert witness and provides recommendations for school-based services, but he has never been a teacher or worked in a public school. AR 1204-06 (Wilson); AR 3330-42 (C.V.)

scale that resulted in his autism diagnosis. AR 1354-56 (Wilson). Dr. Wilson also did not

recommend E.W. receive any services specific to autism but stated his recommendations were

general and "would include someone" on the autism spectrum. AR 1356 (Wilson) ("So all of the

recommendations I have included here could be on any one of those specific disabilities I'm

indicating here."); *see also* AR 3354-58. Dr. Wilson also did not recommend E.W. participate in

a DHH program. AR 3354-58; AR 1363-64 (Wilson).

Following the meeting, the District again contracted with WD/BP to have Ms. Packard,

the Deaf/Blind intervener coach who was involved in the November 2021 Reevaluation, train the

staff working with E.W. at Goodman. AR 2430-36; AR 3572.

8.    E.W.'s IEP Team Presents a Draft IEP in November 2023.

E.W. began attending Goodman on September 25, 2023. AR 2439; AR 1655 (Parent);

AR 1251-52, 1588 (Rush). Kari Hyatt served as E.W.'s special education teacher and case

manager. AR 867 (Hyatt). Ms. Ficca, Ms. Crum and Ms. Crowder supported E.W. as her

interveners. AR 875 (Hyatt); AR 939 (Ficca); AR 948 (Crum); AR 965 (Crowder).

Using the plan from the September 2023 IEP team meeting, District staff began gathering

data on E.W.'s performance. AR 880, 882, 898 (Hyatt); AR 1111-12 (Daugherty);[13] AR 987-91

(Lewis);[14] AR 972, 975-76 (Amici)[15]. On September 28, 2023, Ms. Packard from the WD/BP

observed E.W. and recommended several strategies for the IEP team to consider did not identify

a need for any significant programmatic changes. AR 2437-47.

---

[13] Marcy Daugherty was the TVI working with E.W. at Goodman. She has worked with several
Deaf/Blind students. AR 1109-10, 1132-33 (Daugherty).

[14] Gabriela Lewis was the SLP working with E.W. at Goodman. Ms. Lewis has been a SLP since
2020 and previously worked with a Deaf/Blind student. AR 985, 994 (Lewis).

[15] Loren Amici provided E.W. OT services and had been an OT for 12 years. AR 970 (Amici).

ORDER ON ADMINISTRATIVE APPEAL -
18

1    On October 5, 2023, Dr. Wilson observed E.W. at Goodman. AR 3363-68. Dr. Wilson

2  "noted formidable challenges stemming from communication barrier that [E.W.] encounters as a

3  Deafblind student…." AR 3326. What "leaped out" about his observation is that E.W. did not

4  need to be engaged because staff "essentially do nearly everything for her. The communication

5  barrier was so significant that it may have felt to teachers and paraeducators that they had no

6  other choice." AR 3327. According to Dr. Wilson, E.W. is entirely capable of communicating

7  and learning but is not in the right environment for that to occur because at Goodman, she is

8  "almost entirely isolated from peers and without access to any other students signing." *Id*.

9  Wilson's observation report emphasized the necessity of communication access and appropriate

10  support. AR 3367-68.

11    Parent gave her input and a copy of Dr. Wilson's observation report to the District. AR

12  3610. Parent continued to request to maximize E.W.'s time in general education. AR 3600, 3610;

13  AR 1661 (Parent). Parent did not ask that E.W. participate in a DHH program. AR 3596-3606;

14  AR 1254-55, 1342, 1583 (Rush); AR 892, 896 (Hyatt); AR 1658, 1661 (Parent).

15    On November 1, 2023, E.W.'s IEP team met to review a new draft IEP. AR 2448-87; AR

16  1253-54 (Rush). The draft IEP recommended that E.W. spend only 33.62% of her day in general

17  education, as the team concluded that E.W. needed more access to special education services.

18  AR 2483; AR 1254 (Rush); AR 884-96, 903 (Hyatt); AR 1126-29 (Daugherty); AR 995-97

19  (Lewis); AR 976-77 (Amici). Parent still appeared resistant to increasing E.W.'s time in special

20  education. AR 1128-29, 1142-43 (Daugherty); AR 898 (Hyatt).

21    According to Parent, she learned about Tacoma's DHH program after E.W. started at

22  Goodman and because the District continued to deny the provision of those services for E.W.,

23  Parent made the decision to transfer E.W. to Tacoma. AR 1655 (KW); AR 3376-86, ¶¶11, 13,

15, 29, 33; 3383, AR 1668-69 (KW). At the beginning of the November 1, 2023, meeting, Parent's counsel informed the team that E.W. had been accepted into a DHH program within the Tacoma Public Schools ("TPS")[16]. AR 1254-55, 1583 (Rush). Parent had not previously asked the District to consider E.W. for either a DHH program or any other self-contained special education program. AR 1658, 1661 (Parent); AR 103 (Comstock); AR 1322 (Malek); AR 1509 (Truitt); AR 1387 (Rush). The District understood Parent's long-standing desire was to maximize E.W.'s time in general education. *See*, *e.g.*, AR 2025-26, 3600; AR 1510, 1521 (Truitt); AR 57, 77 (Comstock); AR 1313, 1318 (Malek); AR 891-92, 896 (Hyatt); AR 1130 (Daugherty); AR 1253 (Rush). During the meeting, Parent did not ask the team to consider placing E.W. through the District's IEP at the TPS DHH program. AR 1257, 1387-88 (Rush). Thus, it was understood that TPS would complete the IEP. AR 2488-91; AR 881 (Hyatt); AR 1256, 1392-93 (Rush); AR 1129, 1142-43 (Daugherty).

On November 7, 2023, PSD Special Education Director Rush submitted a Choice Transfer Request to have E.W. transferred to Baker Middle School in the TSD DHH program. FF 1989; AR 3628; AR 2490. TSD's DHH program is specialized on evidence-based practices for deaf and hard of hearing children. (Seago) FF at 61; AR 678 (Seago). Every staff member in the DHH program uses TSL. FF 1989; AR 716 (Seago).

On November 20, 2023, Tacoma issued a PWN stating it received a copy of the November 2023 draft IEP from the District, which it revised and finalized. FF 1990; AR 3673. This new IEP reflected a new placement in the DHH program. FF 1990; AR 3670-3673. The

---

[16] Parent applied for an inter-district transfer to TPS. AR 2488; AR 1255, 1386 (Rush); AR 1658 (Parent). With such a transfer, a student is released from the resident school district and funding is reallocated to the non-resident district. AR 1255, 1389-91, 1526 (Rush); Chp. 392-137 Wash. Admin. Code.

ORDER ON ADMINISTRATIVE APPEAL -
20

revised IEP included a ToD for math, reading, writing, social emotional, and adaptive. AR 3670.

Jennifer Seago, E.W.'s ToD and case manager, provides direct instruction for throughout much

of E.W.'s school day. FF 1991-1992; AR 679 (Seago). Seago has witnessed E.W.'s

independence increase exponentially since starting at the DHH program. FF 1992. She also

determined that E.W. had a language delay upon starting at DHH, "[s]he hasn't had access to

that, because she is quickly picking it up…. but she is getting language from the moment she

gets here to the moment she leaves, through sign, through tactile." AR 692 (Seago). Seago

explained that E.W. needs a ToD because it is evident that ASL is her preferred mode of

communication. *Id*. at 696.50

E.W. began at TPS on November 16, 2023. AR 2492-94; AR 1257, 1526 (Rush). Even

though special transportation was identified in the still-operative June 2022 IEP, Parent

reportedly elected to drive E.W. to and from the TPS DHH program. AR 717 (Seago); AR 2082,

2426, 3387.

C.    Administrative Due Process Hearing

Parent initiated an administrative due process hearing, which was assigned Office of the

Superintendent of Public Instruction Cause No. 2023-SE-0130 and Office of Administrative

Hearings Docket No. 07- 2023-OSPI-01971. ALJ Brown held the administrative hearing on

March 11-15, March 25, and April 5, 2024, heard testimony from 26 witnesses, and issued an

87-page decision. She concluded the District conducted an appropriate educational evaluation of

E.W., offered IEPs that met E.W.'s educational needs, and did not violate the IDEA. The ALJ

denied Parent's request that the District use public funds to reimburse her for her unilateral

decision to place E.W. in private school and for the cost of other private services. Parent now

appeals portions of the ALJ's decision.

ORDER ON ADMINISTRATIVE APPEAL -
21

STANDARDS OF REVIEW

A.    Claims Under the IDEA

The IDEA's primary purpose is to ensure that children with disabilities have access to a free and appropriate public education ("FAPE"). 20 U.S.C. § 1400(c)-(d). This purpose is achieved through the development of an IEP appropriate to the individual needs of the child. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1474-75 (9th Cir. 1993), *cert. denied*, 513 U.S. 825 (1994). In reviewing the substantive appropriateness of an IEP, the question is whether the IEP was, at the time it was developed, reasonably calculated to enable the student to receive educational benefit. *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1498-99 (9th Cir. 1996); *Rowley*, 458 U.S. 176.

The IDEA contains detailed procedural requirements. To be actionable, however, the procedural violation must have: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of an educational benefit. 20 U.S.C. § 1415(f)(3)(E)(ii); Wash. Admin. Code § 392-172A-05105(2); *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1054 (9th Cir. 2022) (recognizing procedural violations are harmless absent this showing).

In an appeal of an administrative decision brought under the IDEA, a court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). In an appeal of the ALJ's decision, the party challenging the decision bears the burden of proof. *Schaffer*, 546 U.S. at 62; *J.W.*, 626 F.3d at 438. Courts in IDEA cases review *de novo* whether a school district has provided a FAPE. *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017). "The court,

1  in recognition of the expertise of the administrative agency, must consider the findings carefully

2  and endeavor to respond to the hearing officer's resolution of each material issue. After such

3  consideration, the court is free to accept or reject the findings in part or in whole." *Ash v. Lake*

4  *Oswego Sch. Dist.*, 980 F.2d 585, 587–88 (9th Cir. 1992).

5                                    DISCUSSION

6  A.     Issues For Review

7         Parent challenges the following portions of the ALJ's decision:

8         (1)    The ALJ erred in determining that the District's November 2021 Reevaluation
               was appropriate because the District failed to evaluate E.W. for sign language
9              or autism, and because it did not include new standardized academic testing;
               and

10        (2)    The ALJ erred in determining the District's IEPs did not deny E.W. a FAPE
11             because the District was obligated to update E.W.'s IEP during the 2021-2022
               school year and the IEPs were inappropriate because they did not provide
12             appropriate intervener services, a ToD or ESY.

13 Dkt. 19.

14        In addition, Parent argues she challenged three additional issues, which she did not

15 explicitly brief. The Court finds Parent failed to appropriately raise these issues or demonstrate

16 error in the ALJ's conclusions.

17        1.     Sign Language Training

18        Parent argues she sufficiently raised the issue of the District's sign language training

19 when she referred to ASL, tactile signing, and Ewing's training in evaluating Deaf/Blind

20 individuals. Dkt. 21 at 2. Parent's brief does not contain any argument contending the ALJ erred

21 in rejecting this issue. The ALJ concluded that "evaluators used the modes of communication

22 [E.W.] could understand at the time and that were likely to yield the most accurate information."

23 AR 1999 (CL 20). Parent does not explain why this conclusion was erroneous.

ORDER ON ADMINISTRATIVE APPEAL -
23

1    2.    Failure to Provide ELS Instruction

2    Parent concedes she did not "explicitly develop an argument section" related to the

3 District's purported failure to deliver E.W. "sign language" instruction, and claims her challenge

4 to the IEP's provision of intervener and ToD services was sufficient to preserve this claim. Dkt.

5 21 at 2. However, Parent points to no evidence establishing that intervener and ToD services are

6 the same as sign language instruction. In fact, Parent asserted these as separate issues at the

7 hearing. AR 1932. The ALJ rejected this challenge on the grounds that "at the time of

8 development of the June 2022 IEP, [E.W.] had dexterity issues that affected her ability to sign

9 and she used some adapted sign language, but it was not [E.W.]'s primary mode of

10 communication." AR 2010 (CL 71). The District provided E.W. instruction in the use of

11 functional signs, which Parent herself later concedes. Dkt. 21 at 7 (noting that District's October

12 2020 provided for instruction in sign language); *see also* AR 2070 (IEP goal targeted at

13 "improving use of functional sign language").

14    3.    Failure to Develop Appropriate IEP Content

15    Parent contends she "explicitly raised" the issue of whether the November 2021

16 Reevaluation led to the development of appropriate IEP content areas. Dkt. 21 at 3. The District

17 agrees Parent asserted the issue at the due process hearing, but as the ALJ observed, Parent "did

18 not brief this issue." ALJ. AR 2000 (CL 25). Thus, the ALJ concluded "[t]he nature of [Parent's]

19 claim is unclear and the evidence on which she relies is not apparent." *Id*. The ALJ nonetheless

20 addressed the claim and rejected it. *Id*. ("[T]here is no evidence demonstrating that the

21 assessments and tests were administered improperly or failed to provide sufficient information to

22 support development of an appropriate IEP."). Parent fails to show any error with the ALJ's

23 conclusion on this issue.

ORDER ON ADMINISTRATIVE APPEAL -
24

1    B.    November 2021 Reevaluation and Denial of IEE at Public Expense

2        Parent argues the ALJ erred in determining that the November 2021 Reevaluation was

3    appropriate because the District failed to evaluate E.W. for sign language and for autism, and

4    failed to conduct new standardized testing in the area of academics.

5        1.    District's Communication Evaluation

6        Parent argues the District's failure to evaluate E.W. for ASL or tactile signing resulted in

7    a communication evaluation that was not sufficiently comprehensive. Dkt. 19 at 23.

8        As part of the November 2021 Reevaluation, Elizabeth Combstock, the District's speech

9    language pathologist ("SLP") evaluated E.W.'s communication skills. This included assessment

10   of E.W.'s verbal abilities, use of her augmented assistive technology ("AAC") device and use of

11   adapted signs, which was the form of sign language E.W. was using at the time to communicate.

12   AR 2117-28; AR 84-88 (Comstock). Ms. Comstock had worked with E.W. since she was four

13   years old and was familiar with E.W.'s communication abilities. AR 34 (Comstock). Ms.

14   Comstock concluded from her examination that E.W. remained eligible for special education

15   services in this area. AR 2117- 28; AR 84-88 (Comstock).

16       The ALJ concluded Parent had not put forward any evidence from a qualified

17   professional establishing that the District's communication evaluation was inappropriate. AR

18   2000-01 (CL 28) (affording little weight to testimony of non-SLP witnesses who were not

19   involved in E.W.'s program at the time of the evaluation).On appeal, Parent does not explain

20   what an evaluation for ASL or tactile signing would have shown regarding E.W.'s abilities that

21   was not already known to the IEP team and included in the evaluation report; particularly, as

22   E.W. was not using either ASL or tactile signing to communicate at that time. *See Crofts*, 22

23   F.4th at 1055 (holding district evaluation was comprehensive where parent failed "to point to any

1    other assessment or evaluation that the District could have administered" to evaluate student).

2    Although Parent now contends she believed signing was E.W.'s "primary mode of

3    communication," this is not borne out by the record. Dkt. 19 at 23; AR 41, 122-23 (Comstock);

4    AR 562, 615, 618 (Alsop); *see also* AR 1417 (Pelligrini) ("And to her ASL was foreign.").

5        There is also no dispute that Parent did not ask the District to evaluate E.W. for sign

6    language. Parent suggests the ALJ "misunderstands" the law in noting this fact (Dkt. 19 at 22),

7    however the record does not support a finding that the ALJ relied solely on the lack of Parent's

8    request to reach her conclusion that the District's communication evaluation was appropriate.

9    Rather, the ALJ found the District comprehensively evaluated E.W.'s communication abilities

10   based on the information available at the time and also observed that Parent did not state she

11   wanted something more or different. AR 2001 (CL 28).

12       Parent also argues the District must evaluate based on the "informed suspicions of

13   parent" (Dkt. 19 at 23) but it is undisputed that she did not raise any such "suspicion" that E.W.

14   required a different type of communication evaluation. Parent contends also that the July 2021

15   audiology report "put the District on notice" that Parent believed tactile signing was E.W.'s

16   preferred form of communication. However, the record reflects Parent did not "discover" tactile

17   signing until she began working with Ms. Alsop months after the District's reevaluation was

18   completed (Dkt. 19 at 23; AR 2349) and, evaluation decisions are not reviewed in retrospect.

19   *See*, *e.g.*, *J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1186 (W.D. Wa. 2002).

20       The ALJ concluded "[t]here is no testimony or other evidence from a licensed SLP that

21   demonstrates that the tests and checklists administered were not sufficient to gather the required

22   relevant information about [E.W.]". The ALJ further noted that Parent relied on the testimony of

23   Dr. Jamie Wilson and "other non-SLPs" to claim the reevaluation was inappropriate but afforded

ORDER ON ADMINISTRATIVE APPEAL -
26

1   less weight to those opinions that used hindsight to judge the reevaluation. AR 2001 (CL 28).

2   "As the trier of fact, the ALJ is in the best position to assess witness credibility and the

3   appropriate weight of testimony." *J.W. ex rel. K.K.W. v. Governing Bd. of E. Whittier City Sch.*

4   *Dist.*, 473 F. App'x 531, 532 (9th Cir. 2012). Parent provides no contrary authority. She argues

5   Dr. Wilson's opinions did not "depend on knowledge gathered after the reevaluation was

6   complete." Dkt. 21 at 6. However, there is no dispute that Dr. Wilson did not evaluate E.W. until

7   May 2023, approximately 18 months after the November 2021 Reevaluation was completed. AR

8   3344; *see also* AR 2001 (CL 28) ("Specifically, Dr. Wilson met [E.W.] more than a year after

9   the Reevaluation, which limits the weight of his opinion about the accuracy of the

10  Reevaluation."). Additionally, Parent does not point to any specific "opinion" from Dr. Wilson

11  regarding the appropriateness of the District's communication evaluation, nor did he appear to

12  render one. Parent references Dr. Wilson's general testimony that only a board-certified

13  neuropsychologist with a background with Deaf/Blind individuals could conduct the generic

14  "types of evaluations" he referenced in his testimony. Dkt. 21 at 7 (citing AR 1154 (Wilson));

15  see also AR 1152-53 (Wilson). Thus, even were Dr. Wilson (a non-SLP) qualified to opine on

16  the District's communication evaluation, he did not do so. As the ALJ correctly concluded, Dr.

17  Wilson's general testimony was insufficient to establish that the communication portion of the

18  November 2021 Reevaluation was inappropriate. AR 2001 (CL 28); *see also Crofts*, 22 F.4th at

19  1053-54 (holding that ALJ appropriately gave limited weight to parent's expert who offered

20  "categorical opinions" and who lacked training in special education matters).

21          Parent also contends she raised a "suspicion" that E.W. required a "different type of

22  communication evaluation," and the District had such suspicions itself based on E.W.'s dual

23  sensory loss. Dkt. 21 at 7. But the District evaluated E.W.'s vision and hearing to gather data on

her visual impairment and recent diagnosis of mild hearing loss. AR 2101-03 (audiology); AR 2138-46 (vision). Parent did not challenge these aspects of the District's reevaluation. Parent appears to be reiterating her argument that the July 2021 audiology assessment put the District on notice that one of E.W.'s main forms of communication was "ASL." Dkt. 21 at 7 (citing AR 2198-2200). However, the evidence established that E.W. used multimodal means of communication, including adapted signs, which was addressed in the reevaluation. AR 2118 (evaluation report stating that E.W. "uses adapted signs" to communicate in addition to other means); *id.* (stating E.W. had met her goal of using "8-10 adapted signs routinely in the classroom setting" and was working on additional signs). Parent further cites to E.W.'s IEP establishing that E.W. used adapted signs to communicate, claiming this supports her argument that the District should have done something more in its reevaluation. Dkt. 21 at 7 (citing AR 2575, 2583, 2585). But as previously noted, the reevaluation considered this information in evaluating E.W.'s communication skills. AR 2118.

The Court concludes the District's communication evaluation was reasonable and thus met the requirements set forth in the IDEA. *See*, *J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1185 (W.D. Wash. 2002) To establish how the District violated the IDEA, Parent must show that the revaluation was not "sufficiently comprehensive to identify all of [E.W.]'s special education and related services needs." 34 C.F.R. § 300.304(c)(6); *see also* Wash. Admin. Code § 392-172A-03020(3)(g) (same). The ALJ properly concluded that Parent failed to do so. AR 2000-01 (CL 27-29).

2.    Autism Assessment

Parent contends the District should have evaluated E.W. for autism based on the results of the BASC-3 rating scales obtained during the November 2021 Reevaluation. Dkt. 19 at 23-24.

1    The ALJ rejected this claim based on the evidence, including Ms. Ewing's "informed

2    opinion that a variety of other causes can result in the same response pattern" that E.W.

3    demonstrated. AR 2001 (CL 32). Ms. Ewing testified that the BASC-3 is not typically used to

4    screen for autism, and Dr. Wilson testified that the BASC-3 is generally not used with deaf

5    individuals at all. AR 395-96 (Ewing); AR 1179-80 (Wilson). The BASC-3 rating report also

6    indicated there could be other reasons for the ratings than autism. AR 2654. Ms. Ewing testified

7    she did not see any need to assess in this area. AR 396, 420-21 (Ewing). The ALJ concluded that

8    this was appropriate. AR 2002 (CL 33). The ALJ noted that Dr. Wilson's "diagnosis" of autism

9    was not based on the ADOS-2 or other recognized autism diagnostic tool despite such tools

10   being available for deaf individuals. AR 2002 (CL 33); *see also* AR 422, 429 (Ewing); AR 1353-

11   55, 1361 (Wilson) (declined to use the ADOS-2 and another deaf-adjusted autism diagnostic

12   tool). And although Dr. Wilson claimed to have used multiple measures to confirm the presence

13   of autism, the record establishes he instead relied on a single rating scale from an unknown

14   respondent. AR 3353, 3360; AR 1354-56 (Wilson); AR 2002 (CL 33).

15   There is also no dispute that no one, including Parent, raised a concern that E.W. might

16   have autism such that further assessment was warranted. This includes Dy Thompson, a BCBA

17   trained in autism interventions. AR 848 (Thompson); AR 3252, 3257.Thus, Parent's reliance on

18   *N.B.*, 541 F.3d at 1209 (finding district violated IDEA when it referred parents to other agency to

19   evaluate based on prior autism findings rather than conducting evaluation itself) and *Amanda J.*

20   *v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892-93 (9th Cir. 2001) (finding district violated IDEA

21   when it did not disclose report indicating "extreme autism" and did not further assess despite this

22   information) is inapposite. Parent also cites to an administrative decision involving the District in

23   which an ALJ concluded that the District should have conducted a vision assessment of a

ORDER ON ADMINISTRATIVE APPEAL -
29

1  student. Dkt. 19 at 23-24 (citing *In re Peninsula Sch. Dist.*, 121 LRP 28097 (SEA WA 2021)). In

2  that case, however, the ALJ concluded the District's evaluator had "independent concerns about

3  the Student's vision and the need for an assessment in this area" such that an evaluation was

4  appropriate. 121 LRP 28097 (CL 49). No such concerns were identified here by anyone working

5  with E.W. Given the absence of a concern regarding autism, the ALJ properly concluded the

6  District was not obligated to evaluate for this disability. AR 2002 (CL 33) ("Based on the

7  information that was available to the assessors at the time of the November 2021 Reevaluation,

8  the District was not required to administer further assessments to test for autism[.]").

9      Parent further contends the ALJ failed to provide a "discrete analysis supporting her

10  ultimate conclusion" on this issue. Dkt. 19 at 24 (quoting J.W., 626 F.3d at 440-41). The ALJ's

11  decision detailed the law governing evaluations and her specific resolution of this issue. AR

12  1996-98 (CL 10-16); AR 2001-02 (CL 31-34).

13      Moreover, Parent fails to establish how any such procedural violation was actionable or

14  denied E.W. a FAPE. *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 n.3 (9th Cir.

15  2006) (alleged procedural violation in evaluation process properly denied absent evidence of

16  resulting prejudice). Although Dr. Wilson "diagnosed" E.W. with autism, he did not recommend

17  any changes to E.W.'s program and instead stated his recommendations would apply to any of

18  E.W.'s disabilities. AR 1356 (Wilson); AR 3354-58. Ms. Ewing also testified that, even if the

19  District's evaluation team had suspected E.W. had autism, "it wouldn't have changed what

20  supports she was given" as she was already receiving support in all areas that a student with

21  autism might receive. AR 396-97 (Ewing). It is also undisputed that E.W. is now being served in

22  a DHH program at TPS and is not receiving any autism-specific services. AR 3694-3729 (TPS

23  IEP). Indeed, the TPS IEP does not even identify autism as adversely affecting E.W.'s education.

ORDER ON ADMINISTRATIVE APPEAL -
30

AR 3701 (adverse impact summary). Given this evidence, Parent cannot establish that the lack of an autism evaluation impacted E.W.'s education in any way or denied E.W. a FAPE.

       3.      <u>The ALJ Properly Concluded Academic Testing Was Not Required</u>

Parent contends the November 2021 Reevaluation was also inappropriate because it did not include new academic testing for E.W. Dkt. 19 at 24-25. Wash. Admin. Code § 392-172A-03020(2)(a) governs the conduct of special education evaluations in Washington and provides that school districts are to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent" when evaluating students. Here, as the ALJ observed, Ms. Ewing used classroom data, a checklist of functional academic skills and the results of standardized testing conducted in December 2020 to assess E.W.'s academic performance and to determine that E.W. remained eligible for special education services in this area. AR 2113-18. The reevaluation thus used a "variety of assessment tools and strategies" as required under the regulation. Parent did not raise any concern with this portion of the reevaluation when it was completed, nor did she ask that any other measures be used to evaluate E.W.'s academic performance. The ALJ thus concluded that Parent "present[ed] no evidence" that the measures Ms. Ewing considered in evaluating E.W.'s academic abilities were insufficient. AR 1999 (CL 23) ("The Parent presents no evidence showing that academic data from [E.W.]'s teachers, the functional academic check list, or information from the prior IEE are insufficient to reflect [E.W.]'s academic progress.").

Parent quotes a separate provision of the regulation stating that "[i]f properly validated tests are unavailable, each member of the group shall use professional judgment to determine eligibility based on other evidence of the existence of a disability and need for special education services." Wash. Admin. Code § 392-172A-03020(3)(a)(iii). Parent ignores that Ms. Ewing did

1   consider the results of prior standardized testing in determining E.W.'s continued eligibility for

2   academic services. AR 2113-18 (reporting results of Styer-Fitzgerald academic assessments).

3   Parent points to no authority holding that a school district is required to conduct new testing in

4   reaching an eligibility determination. *Cf. Robert B. v. West Chester Area Sch. Dist.*, No. CIV.A.

5   04-CV-2069, 2005 WL 2396968, *5-6 (E.D. Penn. Sept. 27, 2005) (decision to not conduct

6   standardized testing did not violate the IDEA where district already had the information it

7   needed to establish the student's needs in relevant area and no evidence that the child's needs

8   had changed substantially); *Avila v. Spokane Sch. Dist.*, 686 F. App'x 384 (9th Cir. 2017)

9   (rejecting IEE request where district completed broad academic evaluation but did not administer

10  specific reading and writing assessments recommended for particular purported diagnoses).

11  Here, Ms. Ewing determined that further academic achievement testing was inappropriate as

12  such tests contain "complex verbal instructions and are not usually appropriate to administer to

13  students who have limited verbal skills or who might not understand what is being asked of

14  them." AR 393 (Ewing). She used her professional judgment to determine that a better source of

15  data was to review E.W.'s actual academic performance in the classroom and on prior testing.

16          Even if the IDEA required the District to conduct new academic testing, Parent fails to

17  establish how the decision not to conduct the testing denied E.W. a FAPE. It is undisputed the

18  November 2021 Reevaluation found E.W. remained eligible for services in all academic areas

19  and presented a detailed analysis of her academic functioning. AR 2113-17. Parent does not

20  explain what additional testing would have added. In fact, when Dr. Wilson evaluated E.W.'s

21  academic abilities a year and a half later, he obtained the same results, *i.e.*, that E.W. had

22  extremely low academic skills due to the impacts of her disabilities. AR 3351.

23

ORDER ON ADMINISTRATIVE APPEAL -
32

Based on the foregoing, the Court affirms the ALJ's conclusion that the District's November 2021 Reevaluation was appropriate and evaluated E.W. in all areas of suspected disability.

C.    Development of IEPs

Parent argues the ALJ erred in concluding the District did not violate the IDEA when it continued to implement the October 2020 IEP during the 2021-2022 school year and denied E.W. a FAPE by not providing appropriate intervener, ToD or ESY services. Dkt. 19 at 26-32.

1.    No Requirement to Update and Implement a New IEP (2021-2022)

Parent first contends the ALJ erred in determining the District did not violate the IDEA by continuing to implement the October 2020 IEP and not updating E.W.'s IEP during the 2021-2022 school year. Dkt. 19 at 26. Parent contends the ALJ determined that the IDEA's "stay put" provision prevented the District from developing a new IEP while the parties' due process filings were pending. *Id.* "Stay put" requires maintenance of a student's educational placement while a due process proceeding is pending unless the district and parent agree otherwise. 20 U.S.C. § 1415(j); Wash. Admin. Code § 392-172A-05125(1)(a).

The ALJ did not reference stay put in her analysis. The ALJ concluded that Parent and the District "agreed to delay development of [E.W.'s] IEP" because Parent filed her own hearing request. AR 2005 (CL 50). Even though it had filed its own hearing request on December 6, 2021, the District drafted a new IEP and held an IEP meeting for E.W. on December 10, 2021. AR 3491-97. At that meeting Parent's counsel stated Parent was filing her own due process proceeding and tabled discussion of E.W.'s IEP. AR 1601 (Parent); AR 2426. When Parent contacted the District in late January 2022 to reconvene E.W.'s IEP team, the District worked with Parent to find a mutually-agreeable date to meet, which was impacted by school breaks and

ORDER ON ADMINISTRATIVE APPEAL - 33

1    Parent's requests for two observations by her private providers. Following those observations,

2    E.W.'s IEP team convened three times to complete discussion of the June 2022 IEP.

3        Based on the foregoing, the Court affirms the ALJ's decision that the District did not

4    violate the IDEA by continuing to implement the October 2020 IEP.

5        2.    ALJ Correctly Concluded the District's IEPs did not Deny E.W. a FAPE

6        Parent contends the District's IEPs denied E.W. a FAPE because it did not offer

7    appropriate intervener services; ToD services; and ESY services.

8        (a)    District Offered Appropriate Intervener Services

9        Parent claims the District's IEP denied E.W. a FAPE because it did not provide services

10   from an "appropriately trained" intervener "at all relevant times." Dkt. 19 at 29-30. The ALJ

11   concluded Parent first requested an intervener be added to E.W.'s IEP in December 2021, the

12   first IEP meeting that led to development of the June 2022 IEP. AR 2006 (CL 55). Parent does

13   not challenge this determination. At the time the prior October 2020 IEP was developed, Parent

14   did not request an intervener, and no member of the IEP team believed such services were

15   necessary. AR 2048 (CL 47). Although Parent later alleged E.W. required an intervener in the

16   Prior Hearing (after the October 2020 IEP was developed), the assigned ALJ concluded such

17   services were not required as there was no evidence E.W. had a hearing disability at the time and

18   because Parent had not requested such services as part of the development of the October 2020

19   IEP. *Id*. Parent first requested an intervener as part of the IEP process in December 2021 and the

20   District agreed to that service to E.W.'s IEP. AR 2422-23.

21       Parent argues the District offered interveners who were not "adequately trained" (Dkt. 19

22   at 29) and that interveners should be trained by a "higher-level university program" as opposed

23   to using the OHOA modules through the WD/BP (AR 2007 (CL 58)). The ALJ rejected this

1    argument, stating "[a]n intervener for the deafblind is not a codified position in Washington and

2    there is no requirement in the state that an individual receive a national certification to work as

3    an intervener." AR 2007 (CL 59). Moreover, there was no evidence that the type of individual

4    acceptable to Parent was available in fall of 2023. AR 1653-54 (Parent); AR 3526 (four

5    credentialed interveners in Washington as of July 2022). Parent challenges the ALJ's conclusion

6    in this respect, but points to no authority requiring that an intervener have particular training or

7    credentials to be qualified. Dkt. 19 at 29. The evidence at the hearing established the contrary.

8    AR 368, 376 (Humes) ("[T]here is nothing in [the] code regarding that position."); AR 214-15

9    (Packard) ("I will add an intervener is not a codified position in Washington State yet."); *see also*

10   AR 3526. Nor does the IDEA require intervener services for Deaf/Blind students at all. AR 607-

11   08 (Alsop); AR 2523.

12          Parent contends that given the ALJ's decision, this means the District could "call[]

13   anyone an intervener." Dkt. 19 at 29. But this is not what the ALJ held or what the record

14   reflects. The District used the OHOA modules to train E.W.'s paraeducators, supplemented with

15   direct support from the WD/BP. AR 2419-24; AR 190-91 (Packard); AR 1238-39 (Rush); *see*

16   *also* AR 1190 (Wilson) (referencing modules used in WA for intervener training). Ms. Packard

17   from the WD/BP testified that such training of paraeducators was standard practice. AR 214

18   (Packard) ("Q: [W]ould you agree in your experience typically a paraeducator sort of becomes

19   the intervener for a student with deafblindness at times? A: Yes, that has -- I think that has

20   always been my experience as it has moved as someone from an educator position to recognize

21   more as an intervener.") Ms. Packard also explained that the OHOA modules "target aspects of

22   intervention and strategies that are appropriate for a student with combined impacts to vision and

23   hearing." AR 190 (Packard); *see also* AR 1519 (Truitt) (explaining purpose of intervener). When

1    Ms. Packard observed E.W. at school, her recommendation was that staff continue to use the

2    OHOA modules to work with E.W. AR 2446-47. Parent contends the District's intervener should

3    have been "at least in the process of becoming a credentialed intervener." Dkt. 19 at 29. Ms.

4    Packard explained that, although the OHOA modules "don't lead directly to a credential or a

5    certification as an intervener . . . the information is much of the same information that an

6    intervener would learn in a certificated program[.]" AR 190-91 (Packard). When asked to

7    explain the difference between the OHOA modules and a university program, Ms. Hume

8    testified that participants in the university programs use the same modules but also create a

9    "portfolio" to demonstrate they meet the requirements to obtain a certification. AR 352 (Hume).

10        The ALJ summarized the evidence regarding the District's intervener training, noting that

11   the OHOA modules contain "much of the same information" as a certificated program, that the

12   modules target interventions and strategies to use with Deaf/Blind students and that it is common

13   practice to train paraeducators to work as interveners. AR 2007 (CL 58); *see also* Dkt. 20 at 28

14   (summarizing evidence); AR 372 (Humes) (stating that, of the 300 students on Washington's

15   Deaf/Blind count, only 20-25 have an intervener, and of those interveners, only 5 hold a national

16   certification). The ALJ concluded that "there is no evidence showing that someone trained on the

17   OHOA modules could not provide sufficient intervener services for [E.W.]." AR 2007-08 (CL

18   59). The ALJ further concluded that Parent failed to establish that "the District denied [E.W.] a

19   FAPE when it provided services using paraeducators training as interveners through [the] OHOA

20   modules, rather than interveners with a national certification or other training." AR 2008 (CL

21   60). The ALJ thus analyzed and rejected the claim Parent makes—namely, that the offered

22   intervener services were not "reasonably calculated" to provide E.W. a FAPE.

23        Parent argues the District was "required to have sufficient expertise to at least recognize

ORDER ON ADMINISTRATIVE APPEAL -
36

that they were not experts" in educating Deaf/Blind students. Dkt. 19 at 29. But the IDEA does not require that an "expert" on any given disability serve on a student's IEP team. *R.P. v. Prescott Unif. Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011). In addition, the District was consulting with such an expert at the WD/BP who provided training and feedback on the District's program. AR 184-88 (Packard) (explaining qualifications, including to serve as a Deaf/Blind intervener coach). Parent further contends the District "eschewed the experts" in developing E.W.'s program, but this is belied by Ms. Packard's involvement and expertise. Dkt. 19 at 30. To the extent Parent is referring to the opinions of Ms. Alsop regarding the need for a university level trained intervener, this opinion must be viewed in light of Ms. Alsop's long-standing advocacy for certification requirements for interveners, which has not been adopted under the IDEA or Washington. AR 541-42 (Alsop).

It is undisputed Parent did not allow the District to implement the intervener services in the June 2022 IEP, as she opted to unilaterally place E.W. at St. Nicholas with Ms. Pelligrini, who was still training as an intervener. On the record, Parent cannot establish that the District's offered interveners were inappropriate. Although Parent may have preferred District staff receive different training, the IDEA does not obligate a school district to adopt a parent's preferred method for implementing their child's educational program. *See*, *e.g.*, *Crofts*, 22 F.4th at 1056-57 (rejecting claim that district had to adopt parent or "expert" methodology recommendations); *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1031 n.5 & 1039 (9th Cir. 2009) (school districts are entitled to deference in determining appropriate teaching methodologies).  The ALJ correctly concluded that Parent failed to meet her burden on this claim.

(b)    Parent Failed to Establish the District Improperly Denied ToD Services

ORDER ON ADMINISTRATIVE APPEAL -
37

1    Parent alleges the ALJ erred in concluding E.W. was not denied a FAPE because her

2    IEPs did not provide for services from a ToD. Dkt. 19 at 30. Parent did not request E.W. receive

3    services from a ToD until the spring of 2022 during the development of the June 2022 IEP. AR

4    2008 (CL 63); *see also* AR 1331 (Malek) (Parent did not request ToD during fifth grade). And,

5    prior to July 2021, E.W. did not have a documented hearing loss. AR 2036 (FF 47); AR 2101-02;

6    AR 170 (McCall). Thus, the ALJ correctly concluded that Parent did not request such service

7    prior to May 2022, and at that time, the request was considered by the District. AR 2008 (CL

8    63). District staff determined it was appropriate to wait to consider adding ToD services until

9    after the intervener was able to work with E.W. AR 2300. Ms. McCall, the District's audiologist

10   with over 30 years of experience working with DHH children, testified this was an appropriate

11   course of action. AR 179-80 (McCall). The ALJ concluded that, due to Parent's unilateral

12   placement, "there was little time to work with an intervener . . . and allow the intervener to assess

13   [E.W.'s] needs." AR 2008 (CL 63). The ALJ further concluded that, based on what was known

14   to the team at the time, "more information was needed before providing a ToD for [E.W.]." AR

15   2009 (CL 65). Parent contends the ALJ erred in crediting Ms. McCall's opinion in this regard,

16   but she points to no authority establishing that Ms. McCall lacked the training or experience

17   necessary to make this determination. Parent's belief that as of May 2022 E.W. needed a ToD is

18   not entitled to more weight than that of the school staff who directly observed E.W. and were

19   developing her program at the time. *See*, *e.g.*, *N.B.*, 541 F.3d at 1212 (upholding credit given to

20   testimony of staff who observed student's performance over parents' experts who lacked such

21   observations).  Parent also argues the ALJ "failed to analyze that [the District] did not have a

22   ToD on staff," positing that the District could not ascertain whether such services were required

23   as a result. Dkt. 19 at 30. As previously noted, an IEP team is not required to include "experts."

1    *R.P.*, 631 F.3d at 1122. Moreover, the ALJ concluded "the District considered input from both

2    Ms. Humes and Ms. Alsop" in developing E.W.'s June 2022 IEP, and further noted Ms. Alsop

3    did not include a ToD among her recommendations. AR 2008-09 (CL 63-64); AR 621 (Alsop).

4    Parent also argues that Ms. Alsop's opinion that E.W. lacked access to her educational

5    environment, put the District "on notice" that ToD services were necessary. Dkt. 19 at 31.

6    However, Ms. Alsop did not include this in her recommendations to E.W.'s IEP team. The ALJ

7    also noted that Dr. Wilson's later recommendation for a ToD came after the June 2022 IEP was

8    developed, as Parent concedes. *Id.*; Dkt. 19 at 31. The appropriateness of an IEP is to be judged

9    at the time it is developed, not in hindsight. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047 (9th

10   Cir. 2012); *see also Adams v. State of Oregon*, 195 F.3d 1141, 1149-50 (9th Cir. 1999) ("Instead

11   of asking whether the [IEP] was adequate in light of [the student's] progress . . . the more

12   pertinent question [is] whether the [IEP] was appropriately designed and implemented so as to

13   convey a meaningful benefit [to the student].") The IDEA's "snapshot" rule establishes that the

14   testimony from TPS staff at E.W.'s current program is irrelevant to assessing the reasonableness

15   of the team's determinations in June 2022.  *See*, *e.g.*, *Adams*, 195 F.3d at 1149-50.

16   Although Parent believes this service would have maximized E.W.'s program, this is not

17   what the IDEA requires. An "appropriate" public education does not mean the absolutely best or

18   "potential maximizing" education for the individual child. States are obligated to provide "a

19   basic floor of opportunity" through a program "individually designed to provide educational

20   benefit to the handicapped child." *Ojai*, 4 F.3d at 1474-75 (quoting *Rowley*, 458 U.S. at 201); see

21   also *Endrew F.*, 580 U.S. at 386 ("Any review of an IEP must appreciate that the question is

22   whether the IEP is reasonable, not whether the court regards it as ideal.").

23   Parent also relies on intent language contained in Rev. Code Wash. § 28A.410.225,

ORDER ON ADMINISTRATIVE APPEAL -
39

1  which states that deaf students can benefit from services from an educator trained to understand

2  the communication issues they face, and a ToD is one such person. Dkt. 19 at 31. However, this

3  intent language does not require the provision of ToD services to DHH individuals. Moreover,

4  there is no evidence that E.W.'s service providers, including Ms. McCall (audiologist) and Ms.

5  Comstock (SLP), could not appropriately support E.W.'s communication needs. Parent cannot

6  establish the ALJ erred in concluding that the decision to defer ToD services in the June 2022

7  IEP pending implementation of intervener services did not violate the IDEA or deny E.W. a

8  FAPE given the information available at the time.

9        (c)    The District Offered Appropriate ESY Services and Parent Declined

10       Parent also contends the District failed to provide E.W. "personalized" ESY services

11  based on her claim that the District offered a "preset" program without intervener services. Dkt.

12  19 at 31-32. It is undisputed that Parent declined ESY services for E.W. AR 1650 (Parent). Other

13  than her own testimony regarding her "understanding of ESY," Parent did not offer any evidence

14  that the services the District offered were inconsistent with the requirements of Wash. Admin.

15  Code § 392-172A-02020. AR 1650 (Parent); AR 2012-13 (CL 76-78); *see also N.B.*, 541 F.3d at

16  1211-12 (identifying purpose of ESY and denying parents' claimed denial of ESY). Parent did

17  not discuss the District's offered ESY program with the District but instead, requested the

18  District hire her private provider (who was not a trained intervener) to work with E.W. during the

19  summer. AR 1650-51 (Parent).

20       Based on the foregoing, Parent has failed to establish that the ALJ erred in finding that

21  the District's decision to decline this request violated the IDEA.

22

23  D.    Parent Is Not Entitled to Any Remedy

ORDER ON ADMINISTRATIVE APPEAL -
40

Parent seeks payment of E.W.'s tuition at St. Nicholas and reimbursement of other related costs (*i.e.*, Dr. Wilson's IEE; years of intervener and ToD services; ASL tutoring for the family), costs and attorney fees.

Because Parent did not establish any IDEA violation, the ALJ properly concluded she was not entitled to any remedy. AR 2015. Reimbursement for private services is only required where (1) the public placement failed to offer the child a FAPE, and (2) the private services were proper under the IDEA. 20 U.S.C. § 1412(a)(10)(C); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-13 (1993). If a district shows its placement was appropriate, the analysis ends, and a party is not entitled to public funds for privately-obtained services. *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011).

Because Parent failed to establish the District's IEPs denied E.W. a FAPE, she is not entitled to recover reimbursement for private services and related costs.

<u>CONCLUSION</u>

Because Parent has failed to establish the ALJ committed reversible error on any of the claims she appeals, the ALJ decision is **AFFIRMED**, and the complaint is dismissed with prejudice.

DATED this 5th day of June, 2025.

BRIAN A. TSUCHIDA
United States Magistrate Judge